LAWRENCE I. WASHOR
WASHOR & ASSOCIATES
California Bar No. 75180
lwashor@washor.com
21800 Oxnard Street, Suite 790
Woodland Hills, California 91367
Telephone: (310) 479-2660
Facsimile: (310) 479-1022

FILED

11 MAR 15 PM 2: 51

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

Attorneys for Plaintiffs Endicott Management Partners, LLC
and Kenneth L. Londoner

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENDICOTT MANAGEMENT PARTNERS, LLC, a Delaware Corporation, and KENNETH L. LONDONER, a Connecticut resident | SACV11-00421 JVS MLGx CIVIL ACTION NO. COMPLAINT |
| Plaintiffs, | |
| vs. | |
| FREELINE SPORTS, INC., a Delaware corporation, RENEE TUZEE, a California resident, RYAN FARRELLY, A California resident, DENNIS CHATEAUNEUF, a Massachusetts resident AND CHARLES W. REDEPENNING, a Massachusetts resident, INCLUSIVE, | |
| Defendants. | |

Plaintiffs Endicott Management Partners, LLC ("Endicott") and Kenneth L. Londoner by, and through, their attorneys, for their Complaint herein, respectfully allege:

## PARTIES:

1.      Endicott Management Partners, LLC, is a limited liability company, duly organized and existing under the laws of the State of Delaware.

2.      Kenneth L. Londoner is an individual residing in the State of

1

WASHOR & ASSOCIATES
Counselors at Law

1 | Connecticut.  Mr. Londoner is the Managing Member of Endicott.

2 |      3.     Defendant Freeline Sports, Inc. ("Freeline"), is a Delaware corporation
3 | which maintains its principal office in Irvine, California.

4 |      4.     Plaintiffs are informed and believe and based thereon allege that at all
5 | times relevant hereto, defendant Ryan Farrelly was the Co-Founder and President of
6 | Freeline, a control person at Freeline, and a resident of the state of California.

7 |      5.     Plaintiffs are informed and believe and based thereon allege that at all
8 | times relevant hereto, defendant Renee Tuzee was the Chief Executive Officer of
9 | Freeline, a control person at Freeline, and a resident of California.

10 |      6.     Plaintiffs are informed and believe and based thereon allege that at all
11 | times relevant hereto, defendant Dennis Chateauneuf  was the Chairman of the
12 | Board of Directors and Chief Operations Officer of Freeline, a control person at
13 | Freeline, and a resident of the Commonwealth of Massachusetts.

14 |      7.     Plaintiffs are informed and believe and based thereon allege that at all
15 | times relevant hereto, defendant Charles W. Redepenning, also known as Chuck
16 | Redepenning , was a director and a control person of Freeline and that his duties
17 | included serving as head of Freeline's international and footwear divisions, the
18 | solicitation of investments, global business development, international sales and
19 | marketing.  Plaintiffs are further informed and believe, and based thereon further
20 | allege that Mr. Redepenning, is a resident of the Commonwealth of Massachusetts.

21 |      8.     Plaintiffs are informed and believe and based thereon allege that other
22 | persons were representatives, agents, employees, contractors, directors or affiliates
23 | of Freeline and in such capacity, conspired with the named defendants or otherwise
24 | participated in the fraudulent conduct alleged herein, and/or for some other reason
25 | are culpable and liable for Plaintiffs' losses alleged herein.  Plaintiffs reserve the
26 | right to amend this Complaint to identify such persons and their conduct when such
27 | facts become known to plaintiffs.

28 |

WASHOR & ASSOCIATES
Counselors at Law

9.     Plaintiff is informed and believes, and upon such information and belief alleges, that at all times relevant hereto, each of the defendants was the agent, representative, and alter ego of each of the other defendants, was acting within the course and scope of such agency and employment, and was so acting with full knowledge and consent, express or implied, of each of the other defendants.

10.    Plaintiffs are informed and believe, and upon such information and belief allege, that:

(a)    Defendants Dennis Chateauneuf, Renee Tuzee, Ryan Farrelly, Charles Redepenning and various other presently unknown individuals, inclusive, and each of them (collectively, "Alter Ego Parties"), formed and used  Freeline, as a mere instrumentality and conduit through which, for their own convenience, they conducted their own business;

(b)    The Alter Ego Parties, and each of them, have dominated and controlled Freeline from its inception to the extent that Freeline has no business of its own;

(c)    There is such a unity of interest and ownership between the Alter Ego Parties, and each of them, on the one hand, and Freeline, on the other hand, that a separate personality of Freeline from the Alter Ego Parties, and each of them, does not exist, and has not existed, since the inception of Freeline, and Freeline is, and at all times since its inception has been, the alter ego of the Alter Ego Parties, and each of them, and merely the conduit through which the Alter Ego Parties, and each of them, performed the acts hereinafter alleged;

(d)    The Alter Ego Parties, and each of them, have failed to maintain any separation of existence between Freeline, on the one hand, and the Alter Ego Parties, and each of them, on the other hand, and have intermixed the business affairs of Freeline, on the one hand, with the Alter Ego Parties, and each of them, on the other hand, so as to cause them to be viewed as a single entity; and

WASHOR & ASSOCIATES
Counselors at Law

1    (e)    Plaintiffs are informed and believe, and based upon such

2  information and belief allege, that at all times relevant hereto, the Freeline was

3  grossly undercapitalized and the business conducted through the guise and conduit

4  of Freeline was insolvent and has remained in such condition at all times during

5  such period.

6         It is, and would be, inequitable and unjust to recognize any corporate

7  identity of Freeline separate and apart from the Alter Ego Parties, and each of them.

8                    **JURISDICTION AND VENUE**

9    11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §

10  1331 in that the action arises under the laws of the United States. This Court has

11  pendant jurisdiction over the remaining state law claims.

12    12.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a), in that

13  it is a judicial district in which a substantial part of the events or omissions giving

14  rise to the claims occurred and it is the exclusive district in which the parties agreed

15  that the claims hereafter set forth can be brought.

16                    **FACTUAL ALLEGATIONS**

17    13.    Endicott was formed to provide consulting services to assist

18  entrepreneurial developmental stage companies in devising and executing successful

19  growth strategies. After discussions and the review of information provided by the

20  company, Endicott devises a general strategy for the company which makes sense

21  based upon the information provided by the company. If, at that point, the company

22  desires to proceed, Endicott enters in to a consulting agreement with the company.

23  Once retained, Endicott works closely the company to create and implement a plan

24  to take its business to the next level by providing access to both financial and human

25  capital. In addition, Endicott provides the company with the knowledge,

26  experience, and resources necessary successfully to execute its business plan.

27  Essentially, Endicott provides an integrated set of business solutions to transform

28

WASHOR & ASSOCIATES
Counselors at Law

1    the company from an early stage business to an emerging growth company.

2        14.    In late April, 2010, Freeline contacted Mr. Londoner to request

3    assistance in obtaining the resources to build Freeline into a successful and

4    profitable operating entity.  In order to determine whether Endicott could assist

5    Freeline, Mr. Londoner spoke to each of Mr. Chateauneuf, Mr. Redepenning, Ms.

6    Tuzee, and Mr. Farrelly about Freeline.

7        15.    During the period of late April, 2010, through May, 2010, Mr.

8    Chateauneuf, Mr. Redepenning, Ms. Tuzee, and Mr. Farrelly , and each of them,

9    made numerous oral and written misrepresentations to Mr. Londoner with respect to

10   Freeline's skates, the demand for Freeline's products, Freeline's existing inventory

11   and product manufacturing and delivery pipelines, the amount Freeline products on

12   retail shelves for sale, Freeline's financial status, and Freeline's ongoing marketing

13   and manufacturing capabilities and efforts, including, without limitation, the

14   following:

15       (a)    Freeline skates were being sold by a host of retailers in the US

16   and were being distributed in Asia;

17       (b)    Freeline skates were being manufactured by a Chinese

18   manufacturing facility which could quickly fill any orders for skates and therefore,

19   the product pipeline was continuous;

20       (c)    From 2007 through 2009, Freeline had generated $2,300,000 in

21   revenue from the sale of skates and that Freeline had in excess of $900,000 in

22   operating profit;

23       (d)    Freeline had recruited and engaged a large skate team of

24   professional and qualified Freeline skaters, who had attended, and in the future,

25   would attend many marketing events, at which Freeline skates would be

26   demonstrated to build the demand for the product;

27       (e)    Demand significantly exceeded supply on a global basis and that

28

1  the international demand for the product was massive;

2      (f)   Freeline needed to raise approximately $2,000,000 in the B2
3  round and the bridge financing in order to have more than ample funding to make
4  25,000 units of skates for sale worldwide during the November/December 2010
5  holiday season;

6      (g)   Management anticipated amount of revenue and operating profit
7  that could be generated with approximately $5,000,000 in funding, Freeline could
8  generate approximately $2,600,000 in revenue in the twelve (12) months post-
9  funding, approximately $8,300,000 in revenue in year 2, and approximately
10  $15,000,000 in revenue in year 3 with an approximately fifty percent (50%) of
11  operating profit;

12      (h)   The desired investment capital was necessary to expand the
13  business of Freeline; and

14      (i)   Charles Redepenning was deeply involved in the business of
15  Freeline and that he would start working for Freeline full time upon the close of a
16  bridge financing for Freeline.  Mr. Redepenning had been the president and COO at
17  Stride Rite, a NYSE listed billion dollar company, and had substantial industry
18  expertise and many industry relationships.   Mr. Redepenning's active participation
19  in Freeline's management was extremely important to Mr. Londoner because he was
20  the only member of the Freeline management team with any significant retail
21  consumer goods experience.

22      16.   The representations were made repeatedly by defendants during April
23  and early June 2010.  For example, the representations were made during a meeting
24  between Mr. Londoner and Mr. Chateauneuf at Mr. Londoner's home in
25  Connecticut on May 4, 2010.  The representations were also made in a May 11,
26  2010, conference call among Mr. Londoner, Mr. Chateauneuf, Ms. Tuzee, and Mr.
27  Farrelly.  The representations were also made during a May 17, 2010, meeting

28

WASHOR & ASSOCIATES
Counselors at Law

1    between Mr. Londoner and Mr. Redepenning at the Boston Four Seasons Hotel.

2         17.    The representations set forth in paragraph 15 were false in that:

3              (a)    Plaintiffs are informed and believe, and upon such information

4    and belief allege, that Freeline skates were not being sold by a host of retailers in the

5    US and were not being distributed in Asia.  In fact, plaintiffs are informed and

6    believe, and upon such information and belief allege, that Freeline had failed to pay

7    its Chinese manufacturer and as such it was unable to acquire skates and that

8    Freeline had failed to pay its Japanese distributor or provide it with skates;

9              (b)    Freeline's Chinese manufacturing facility was not making skates

10   for Freeline since it has not been paid and there was no product pipeline for

11   Freeline. Furthermore, although Freeline was attempting to find a US manufacturer

12   for its skates, it was unable to do so;

13             (c)    Plaintiffs are informed and believe, and upon such information

14   and belief allege, that from 2007 through 2009, Freeline had not generated

15   $2,300,000 in revenue from the sale of skates and Freeline did not generate in

16   excess of $900,000 in operating profit;

17             (d)    Freeline did not employ a large team of professional and

18   qualified Freeline skaters, who had attended, and in the future, would attend many

19   marketing events, at which Freeline skates would be demonstrated to build the

20   demand for the product.  Plaintiffs are informed and believe, and upon such

21   information and belief allege, that the most skaters which Freeline had were six (6)

22   of which only two (2) were paid;

23             (e)    Demand significantly did not exceed supply on a global basis.

24   Plaintiffs are informed and believe, and upon such information and belief allege,

25   that and that the Chinese factory previously employed by Freeline and possibly

26   other facilities were manufacturing "Knock-Offs" of Freeline skates which were

27   being sold by companies other than Freeline;

28

WASHOR & ASSOCIATES
Counselors at Law

1    (f)    Freeline was unable to make 25,000 units of skates for sale

2  worldwide during the November/December 2010 holiday season because it did not

3  have a manufacturing facility available to manufacture the skates;

4    (g)    Plaintiffs are informed and believe, and upon such information

5  and belief allege, that Management could not have in good faith anticipated the

6  stated amounts of revenue and operating profit based upon Freeline's actual

7  financial condition, its lack of manufacturing capability, and the significant number

8  of knock-offs available for purchase in the market;

9    (h)    Plaintiffs are informed and believe, and upon such information

10  and belief allege, that the desired investment capital was intended to pay of old

11  debts, including a large amount of unpaid back salary to the defendants and that in

12  truth, Freeline was insolvent; and

13    (i)    Plaintiffs are informed and believe, and upon such information

14  and belief allege, that Mr. Redepenning was not as deeply involved in the business

15  of Freeline as represented and that he did not intend to start working for Freeline full

16  time upon the close of a bridge financing for Freeline.

17    18.    The oral misrepresentations set forth in paragraph 15 were supported

18  by documentation provided by defendants to Mr. Londoner, which contained the

19  same misrepresentations.  The documentation included, inter alia, the Series B Stock

20  Purchase Agreement, a Confidential Executive Summary, dated April, 2010, and

21  Investor Deck, dated May 20, 2010.

22    19.    The Confidential Executive Summary, dated April, 2010, was given to

23  Mr. Londoner by Mr. Chateauneuf in May, 2010 and makes, inter alia, the following

24  misrepresentations:

25    (a)    Freeline has generated more than $2,000,000 in revenue since its

26  launch and it has sold more than 30,000 pairs of skates;

27    (b)    Freeline anticipated generating "a break-even $1.5 million in

28

WASHOR & ASSOCIATES
Counselors at Law

1 | 2010;"

2       (c)    Freeline has a "strong patent position;"

3       (d)    Freeline has a "good existing sales network, including retailers

4 | such as Sports Chalet;"

5       (e)    The "Freeline Skate Team, comprised of the top 65 male and

6 | female U.S. riders, conducts demos and 'learn to ride" events at various skate parks

7 | schools, and events;

8       (f)    Freeline's "custom wheels are produced by a domestic

9 | manufacturer of high-quality skateboard wheels and a leading skateboard wheel

10 | manufacturer in China. Current manufacturing capacity is 120,000 skate sets

11 | annually, which can be ramped up to 50,000 per month in 120 days;" and

12       (g)    Freeline "sells its products direct to consumers, wholesale to

13 | over 30 independent board shops throughout the U.S. and Europe; at 55 Sport

14 | Chalet outlets in California, Nevada and Arizona; at 30 Big Five outlets in

15 | California and through distributors in Argentina, Australia, Canada, China,

16 | Columbia, France, Germany, Holland, Italy, Korea, Japan, New Zealand, Russia,

17 | Spain, Sweden and Switzerland."

18     20.    The representations set forth in paragraph 19 were false in that:

19       (a)    Plaintiffs are informed and believe, and upon such information

20 | and belief allege, that Freeline has not generated more than $2,000,000 in revenue

21 | since its launch and it has not sold more than 30,000 pairs of skates. Plaintiffs do not

22 | know the exact amounts since despite repeated requests the raw data was never

23 | provided in a verifiable form;

24       (b)    Plaintiffs are informed and believe, and upon such information

25 | and belief allege, that based upon its large outstanding debt, its lack of any

26 | manufacturing capacity, and its lack of operating capital, Freeline did not anticipate

27 | generating "a break-even $1.5 million in 2010;"

28

WASHOR & ASSOCIATES
Counselors at Law

1          (c)    Freeline did not have a strong patent position.  In fact, third

2 parties had filed patents on the skates prior to Freeline in China and Korea. Also, the

3 market was being flooded with knock-offs which Freeline could not stop while

4 Freeline lacked the ability to manufacture additional skates;

5          (d)    Freeline did not have a "good existing sales network." Freeline's

6 inability to deliver skates had alienated many of the companies that had previously

7 purchased skates from Freeline and many companies were selling the knock-off

8 skates;

9          (e)    Freeline did not have, and never had, a Skate Team, comprised

10 of 65 U.S. riders and Freeline's riders did not compete at many of the "scheduled"

11 events;

12          (f)    Freeline's was unable to obtain skates from its Chinese

13 manufacturer due to its failure to pay the manufacturer.  Freeline did not have a

14 domestic manufacturer for its skates and its attempts to obtain a US manufacturer

15 failed. Freeline did not have the manufacturing capacity to manufacture 120,000

16 skates sets per year or the ability to ramp up production to 50,000 skate sets per

17 month. Plaintiffs are informed and believe, and upon such information and belief

18 allege, that the development of US production of Freeline skates would require a

19 suitable US manufacturer to be found and funded, and that such manufacturer would

20 need to create new molds from scratch and complete feasibility and safety testing of

21 the resulting skates, before the manufacture of skates could be commenced, and that

22 such process would probably take a minimum of six (6) months; and

23          (g)    Freeline did not have the stated distribution outlets and even if it

24 could obtain the outlets, it did not have the skates, or the ability to manufacture

25 skates, to supply them with product. Plaintiffs are informed and believe, and upon

26 such information and belief allege, that many of the outlets were selling the knock-

27 off products.  Plaintiffs are further informed and believe, and upon such further

28

WASHOR & ASSOCIATES
Counselors at Law

1  information and belief allege, that for several prior months the "Freeline" skates on

2  the shelves of the retailers were knock-offs and that Freeline did not have any

3  inventory of Freeline skates for delivery to retailers.

4       21.    During May, 2010, after numerous discussions, Freeline decided to

5  engage Endicott to perform consulting services for Freeline.  Endicott developed

6  and recommended a three-part strategy to position the company toward a Reverse

7  Merger and a concurrent financing to take the company public.  The first stage is

8  focused on raising the appropriate amount of initial working capital to enable the

9  company to meet its short term financial needs while working to establish a

10  mutually agreeable financial plan for more significant funding.  The proposed

11  amount of necessary working capital was based upon Freeline representations as to

12  its current financial condition and its short term capital needs. In the second stage,

13  Endicott was to introduce Freeline to organizations to assist in the execution of the

14  reverse merger process.    If necessary, Endicott would introduce Freeline to an

15  appropriate investment bank.  Endicott would introduce Freeline to an appropriate

16  investor relations company, an SEC-compliant audit firm, and a leading law firm

17  that specializes in reverse merger advice and that can work with the company once

18  the company is publically-trading.  Endicott would also assist Freeline in building

19  an appropriate Board of Directors that would afford Freeline credibility in the

20  financial markets and superior guidance in pursuing its business goals.  Finally,

21  Endicott would assist Freeline in carrying out its plan of operations after the

22  completion of the Reverse Merger and the initial funding.  Freeline and Endicott

23  commenced negotiating an agreement to confirm their arrangement.

24       22.    While the negotiations were ongoing, Freeline proposed that Mr.

25  Londoner personally participate in the B2 financing round by investing in Freeline's

26  Series B offering.  Mr. Londoner agreed.  Among the documents forwarded to him

27  for execution, Mr. Londoner was sent a Series B Stock Purchase Agreement.  The

28

WASHOR & ASSOCIATES
Counselors at Law

1 | Agreement was provided by Mr. Chateauneuf and Ms. Tuzee and executed by Ms.
2 | Tuzee.

3 |      23.    The Series B Stock Purchase Agreement represented, <u>inter alia</u>, that:

4 |      (a)    There is no "action, suit, proceeding or investigation pending
5 | against . . . [Freeline] . . . before any court or governmental agency".

6 |      (b)    ". . . [Freeline] . . . is not in material default under any contract to
7 | which it is a party;"

8 |      (c)    ". . . [Freeline] . . . is not indebted, directly or indirectly, to any
9 | of its officers or directors;"

10 |      (d)    There has been no resignation of any key employee since August
11 | 31, 2008; and

12 |      (e)    Freeline has delivered to potential investors in the B2 round
13 | financial statements as of December 31, 2009.

14 |      24.    The representations set forth in paragraph 23 were false in that:

15 |      (a)    Plaintiffs are informed and believe, and upon such information
16 | and belief allege, that there was a California Department of Labor proceeding
17 | against Freeline by Michael Kelly, the person formerly in charge of Freeline's sales
18 | efforts.  The proceeding sought damages in excess of $25,000 for unpaid accrued
19 | salary;

20 |      (b)    Plaintiffs are informed and believe, and upon such information
21 | and belief allege, that Freeline was in default under numerous agreements for its
22 | failure to pay for the services and products received, including, without limitation,
23 | its agreements with its Chinese manufacturer and its Japanese distributer.  Plaintiffs
24 | are further informed and believe, and upon such further information and belief
25 | allege, that Freeline failed to honor its delivery obligations under arrangements with
26 | various US distributers and retailers;

27 |      (c)    Freeline owed significant back salary to its officers and directors;
28 |

WASHOR & ASSOCIATES
Counselors at Law

1     (d) Mr. Kelly quit due to non-payment of his salary;

2     (e) December, 2009, financials were never delivered to Mr.

3 Londoner

4   25. While the Consulting Agreement between Endicott and Freeline was

5 being negotiated, Endicott received an investor deck, dated May 20, 2010, from

6 Freeline in order to assist Freeline in the preparation of a better investor deck.  The

7 deck contained various summary financial information for incorporation in the new

8 deck.  Although raw financial data was requested, it was not provided. The deck was

9 provided to Endicott by Mr. Chateauneuf.

10   The investor deck provided by Freeline contained the summary financial

11 information.  The deck reiterated that Freeline had generated $2,100,000 in revenue

12 with a forty-eight percent (48%) margin from 2007 through 2010.  For the same

13 period, it showed a manufacturing delivery cycle in "$400,000 LOC" (sic)

14 increments.  The deck also projected $2,698,414 in revenue, with a fifty-three

15 percent (53%) margin in the initial twelve (12) months post funding. It also projects

16 $2,374,000 in gross expenses (excluding cost of goods sold) for a net operating loss.

17   The foregoing information also appears inaccurate in that:

18     (a) Plaintiffs are informed and believe, and upon such information

19 and belief allege, that Freeline did not generate $2,100,000 in revenue with a forty-

20 eight percent (48%) margin between 2007 and 2009; and

21     (b) Plaintiffs are informed and believe, and upon such information

22 and belief allege, that Freeline did not have a source of product that could deliver

23 skates in $400,000 increments post-closing since its only manufacturer was refusing

24 to do business with Freeline due to Freeline's failure to pay its bills;

25     (c) Plaintiffs are informed and believe, and upon such information

26 and belief allege, that based upon Freeline's large outstanding debt and its lack of

27 any manufacturing capacity, Freeline knew that it would be unable to achieve the

28

WASHOR & ASSOCIATES
Counselors at Law

1  stated sales figures and the stated margin in the twelve month period post-closing;

2        (d)    Plaintiffs are informed and believe, and upon such information

3  and belief allege, that based upon its large outstanding debt, the state of Freeline's

4  manufacturing and distribution outlets, and the large number of knock-offs in the

5  market, its loss during the initial twelve (12) months post-closing would be far

6  greater than represented; and

7        (e)    Plaintiffs are informed and believe, and upon such information

8  and belief allege, that Freeline knew that the costs represented as being expended

9  during the twelve (12) month period were actually prior accrued and unpaid

10  expenses, including management salaries.

11       26.    In addition, Plaintiffs are informed and believe, and upon such

12  information and belief allege, that Freeline, and its control parties, failed to disclose

13  the following material information to potential investors, including Mr. Londoner,

14  and to Endicott:

15       (a)    Plaintiffs are informed and believe, and upon such information

16  and belief allege, that Freeline was insolvent.  This material fact was not disclosed;

17       (b)    Freeline's Chinese manufacturer was not manufacturing or

18  shipping product for Freeline due to Freeline's failure to pay for past shipments and

19  Freeline did not have an US manufacturer capable of making the skates.  Freeline's

20  attempts to develop US manufacturing had proven unsuccessful.  This material fact

21  was not disclosed;

22       (d)    The market for Freeline's skates was being flooded by a large

23  number of knock-offs.  This material fact was not disclosed; and

24       (e)    Plaintiffs are informed and believe, and upon such information

25  and belief allege, that Freeline was unable to pay its expenses on an ongoing basis.

26  This material fact was not disclosed.

27       Furthermore, plaintiffs are informed and believe, and upon such information

28

WASHOR & ASSOCIATES
Counselors at Law

14

1   and belief allege, that Freeline's control persons, including Mr. Chateauneuf and

2   Ms. Tuzee instructed various Freeline employees and contractor to lied about

3   Freeline's true condition to Mr. Londoner and other potential Freeline investors.

4   Likewise, Ms. Tuzee instructed Mr. Sheppard and Mr. Farrelly to prepare skate team

5   event calendars to include may events which Freeline could not cover, and did not

6   intend to attend, in order to show the event calendars to Mr. Londoner and other

7   potential investors.

8        27.    Furthermore, from early May, 2010 through June 11, 2010, Mr.

9   Londoner exchanged numerous telephone calls and emails with Freeline control

10  persons in which the Freeline control persons solicited his investment in Freeline

11  and Endicott's provision of consulting services to Freeline.

12       28.    On June, 11, 2010, Endicott and Freeline entered into a Consulting

13  Agreement ("Agreement").  Mr. Londoner was also a party to the Agreement for the

14  limited purpose of confirming his decision to invest in Freeline's Series B2

15  Offering. The Agreement was modified and approved by Freeline's counsel.  The

16  Agreement contained, inter alia, the following material terms:

17            (a)    Endicott was to be paid a consulting fee of $7,500 per month.

18  The fee was to be accrued until the closing of an initial funding of $3,000,000.

19  Although the funding was arranged and ready to close, it did not close due to the

20  discovery of Freeline's fraud;

21            (b)    All of Endicott's reasonable business expenses were to be paid

22  after the completion of Stage 1 of the operating plan.  This stage was successfully

23  completed in the summer of 2010, when the bridge financing was obtained,

24  appropriate independent directors were presented, and an appropriate business plan

25  and an appropriate plan of operations were completed; and

26            (c)    Freeline was to obtain specific percentage stock grants on the

27  achievement of certain milestones.  The milestones were calculated based upon oral

28

WASHOR & ASSOCIATES
Counselors at Law

representations and summary financial data provided by Freeline and its control persons.  The initial milestones were not achieved due to the discovery of Freeline's fraudulent representations to Endicott, its bridge lenders, and other potential investors.

A copy of the Consulting Agreement is attached hereto as Exhibit "A."

29.    On June 14, 2010, Mr. Londoner invested $185,000 in the Freeline Series B2 offering.  As a result of his investment, he received 1,121,212 shares of Freeline stock (Certificate B-17) and a Warrant to purchase 89,696 shares of Series B Preferred Stock.

30.    On, or around, June 11, 2010, Mr. Londoner introduced David Stefansky of Harborview Value Master Fund, L.P., and Harborview Master Fund, L. P. (collectively referred to as "Harborview") to Freeline. Mr. Londoner believed that Harborview was a potential source of bridge capital for Freeline.  After the introduction Mr. Stefansky participated in many of Endicott's telephone calls and emails with Freeline control persons.

31.    From May 26, 2010 through August 4, 2010, Mr. Chateauneuf, Ms. Tuzee, Mr. Farrelly, and Mr. Redepenning met regularly with Messrs. Londoner and Stefansky in Freeline's Irvine, California offices, and exchanged telephone and email correspondence for the purpose of soliciting Harborview's investment into Freeline.  As part of that investment solicitation process, Messrs. Londoner and Stefansky were provided numerous documents by such Defendants.

32.    At each of the meetings in Freeline's Irvine offices, including meetings on the dates of May 26, May 27, May 28, June 8, June 9, June 10 and June 26, 2010, Mr. Farrelly, Ms. Tuzee, Mr. Chateauneuf, and Mr. Redepenning made the following verbal and, in some cases written, misrepresentations to Messrs. Londoner and Stefansky for the common purpose and effect of materially overstating Freeline's manufacturing capabilities with respect to its skates, demand for

WASHOR & ASSOCIATES
Counselors at Law

1   Freeline's products, Freeline's existing inventory and product sales pipelines,

2   including stock on the shelves, and Freeline's ongoing marketing capabilities and

3   efforts in order to induce Harborview to invest substantial funds into Freeline. These

4   misrepresentations include the following:

5          (a)    From May through December, 2010, defendants verbally

6   misrepresented to Harborview and other potential investors that Freeline skates were

7   currently being sold by many retailers, including Maui & Sons and Sports Chalet

8   and that Freeline's skates could be found on the shelves of their retail vendors.  Mr.

9   Farrelly physically took Mr. Londoner to the Maui & Sons Venice Beach store

10  where Mr. Londoner was advised by the owner that the store had carried Freeline

11  skates and that the store had hired a rider to help promote the skates.  Mr. Londoner

12  advised Mr. Stefansky of his conversation with the owner. Plaintiffs are informed

13  and believe and based upon such information and belief allege, that the skates which

14  had been offered by Maui & Sons had been knock-offs which had been illegally

15  distributed in violation of Freeline's patent rights and that due to Freeline's dispute

16  with its Chinese manufacturer, Freeline had been unable to deliver skates to Maui &

17  Sons for some time.  Plaintiffs are informed and believe, and based thereon allege

18  that Freeline had been unable to manufacture skates or otherwise provide stock for

19  its retailers for many prior months and that Freeline had virtually no inventory on

20  the shelves of its retailers;

21         (b)    Plaintiffs are informed and believe, and upon such information

22  and belief allege, that defendants verbally misrepresented to Harborview and other

23  investors that Freeline could quickly manufacture the skates it needed to meet the

24  Fall and Winter demand for its skates, once Plaintiffs had invested into Freeline.  In

25  fact, plaintiffs are informed and believe and based thereon allege, that defendants

26  knew that Freeline and its manufacturer in China had terminated their relationship

27  many months earlier due to non-payment by Freeline.  Plaintiffs are further

28

WASHOR & ASSOCIATES
Counselors at Law

1   informed and believe and based thereon allege, that defendants knew at that time

2   that a new manufacturer would have to be found, funded, and would have to create

3   the molds from scratch, and complete feasibility and safety testing of the skates,

4   before manufacturing could be started, and that such process would probably take a

5   minimum of six (6) months;

6            (c)   Plaintiffs are informed and believe, and upon such information

7   and belief allege, that defendants consistently verbally misrepresented to

8   Harborview and other potential investors that the distribution pipeline was

9   continuous and that Freeline needed more capital to prevent an interruption in the

10  manufacturing and distribution pipeline and to keep product "on the water."

11  Plaintiffs are informed and believe and based thereon allege, that defendants knew

12  that such manufacturing and distribution pipeline was terminated long ago as a

13  result in the breakdown of relations between Freeline and its manufacturer due to

14  Freeline's inability to pay past bills, which prevented Freeline from placing orders

15  for additional product;

16           (d)   Defendants misrepresented verbally and in writing to Messrs.

17  Stefansky and Londoner and other potential investors that Freeline had recruited and

18  engaged a skate team of sixty-five (65) professional and qualified Freeline skaters,

19  managed by Anthony Sheppard, who had scheduled and would attend dozens of

20  marketing events, many running concurrently, at which Freeline skates would be

21  demonstrated to build the demand for the skates.  Plaintiffs are informed and believe

22  and based thereon allege that Defendants knew that Freeline never had sixty-five

23  (65) riders, and that Freeline had never, and could not, fund or facilitate even one-

24  tenth of the events on the events schedule prepared for and shown to Harborview

25  and other investors.  Plaintiffs are further informed and believe, and based thereon

26  allege, that Anthony Sheppard had less than six (6) skaters which were directed by

27  Freeline to attend only a small fraction of the events scheduled, despite the fact that

28

WASHOR & ASSOCIATES
Counselors at Law

1  such events schedule was being used by defendants to solicit investments from

2  Harborview and others.   Furthermore, plaintiffs are informed and believe, and upon

3  such information and belief allege, that of the skaters only two (2) were actually

4  funded by Freeline;

5          (e)     Plaintiffs are informed and believe and based thereon allege that

6  defendants provided written projections to Harborview and other potential investors

7  and that such projections misrepresented Freeline's actual projections of future

8  revenue from skate sales, knowing that Freeline had absolutely no chance of

9  meeting those projections;

10         (f)     Plaintiffs are informed and believe and based thereon allege that

11  defendants verbally misrepresented to Harborview that defendants would use the

12  bridge loan funds solicited from Harborview and others in order to pay for 25,000

13  skates sets that had purportedly been ordered, manufactured and shipped from its

14  China manufacturer and sold to existing customers.  Plaintiffs are informed and

15  believe, and based thereon allege, that as of that date, Freeline's relationship with its

16  Chinese manufacturer had been severed due to Freeline's non-payment and 25,000

17  pairs of skates had never been ordered, manufactured, or shipped and that such

18  skates had not been sold to Freeline's existing customers. Plaintiffs are further

19  informed and believe, and based thereon allege, when a limited number of skates

20  were finally ordered and paid for six (6) months later, the new stock had to be

21  airmailed from the manufacturer for delivery for the year-end holiday season and it

22  arrived too late to meet most demand and at a cost that exceeded the projected profit

23  margins and that many of the airmailed skates remain on the shelves of Freeline's

24  retail clients due to the late delivery.  Finally, plaintiffs are informed and believe,

25  and based thereon allege that very little of the bridge funds, if any, raised from

26  Harborview and other investors on August 4, 2010, were used to pay for such

27  skates;

28

WASHOR & ASSOCIATES
Counselors at Law

WASHOR & ASSOCIATES
Counselors at Law

1   (g)   Plaintiffs are informed and believe, and upon such information

2   and belief allege, that defendants misrepresented to Harborview their intention to

3   maintain the salaries of Ms. Tuzee, Mr. Farrelly, and Mr. Chateauneuf at then-

4   current levels.  Plaintiffs are informed and believe, and based thereon allege, that

5   defendants intended at that time, and in or around January 2011 did, cause

6   Freeline's Board of Directors to approve employment agreements which included

7   massive increases in salary and promises of two years' severance pay, at such

8   inflated salary levels, if they were terminated during that period;

9   (h)   Plaintiffs are informed and believe, and upon such information

10  and belief allege, that defendants verbally misrepresented to Harborview and other

11  potential investors at various meetings the international demand for Freeline skates

12  was massive and showing, as proof of the same, demonstrations of skaters using

13  Freeline skates in China, Japan, Europe and Latin America.  Plaintiffs are further

14  informed and believe, and upon such information and belief allege, that the

15  international demand for Freeline skates was nominal; and

16  (i)   Defendants verbally and in certain writings misrepresented, and

17  grossly exaggerated, to Harborview and other potential investors Mr. Redepenning's

18  involvement with the operations of Freeline, representing him as a full time

19  executive of Freeline who would be leading the international sales and marketing of

20  Freeline skates.  Mr. Redepenning boasted an impressive resume in retail, including

21  as President, Chief Operating Officer and General Counsel of Stride Rite, and as

22  manager of major footwear brands including Keds, Sperry Top-Sider, Saucony and

23  Tommy Hilfiger.  Plaintiffs are informed and believe, and upon such information

24  and belief allege, that since Mr. Redepenning was the only member of Freeline

25  management with impressive experience in the retail industry, his participation lent

26  significant credibility to Freeline's management team for Harborview and other

27  investors and the overstatement of his involvement in Freeline was a material

28

1  misstatement to potential investors.  Plaintiffs are informed and believe, and upon
2  such information and belief allege, that Mr. Redepenning's actual involvement in
3  the operations of Freeline was far less than represented and, from time to time,
4  nominal or superficial.

5      33.    In late July, 2010, Messrs. Stefansky and Londoner, along with Maggie
6  Gilliam, Bo Boyd, Bill Uglow, and Bob McNaulty, retail industry experts brought in
7  by Harborview and Endicott to evaluate Freeline and Josh Schwartz, a prospective
8  investment manager, met with Mr. Farrelly, Ms. Tuzee, Mr. Chateauneuf and Mr.
9  Redepenning at Freeline's offices.  Defendants verbally repeated some or all of the
10  misrepresentations alleged above to the persons at that meeting.

11      34.    On, or about, August 4, 2011, Harborview invested $950,000 into
12  Freeline.  Additional bridge loan investors invested an additional $550,000 in
13  Freeline for a total of $1,500,000.  Plaintiffs are informed and believe, and upon
14  such information and belief allege, that such investments were made based on the
15  many misrepresentations set forth above.

16      35. On, or about, November 17, 2010, Harborview invested an additional
17  $200,000 into Freeline.  On, or about, January 14, 2011, invested an additional
18  $119,500 into Freeline.  Plaintiffs are informed and believe, and upon such
19  information and belief allege, that such investments were made based on the many
20  misrepresentations set forth above.

21      36.    From June, 2010 through January, 2011, Endicott introduced Freeline
22  to various potential investors through a series of meetings, telephone conversations,
23  and emails.  Investor documents based on information provided by defendants were
24  provided to potential investors.  Although some of the meetings were between the
25  investors and Mr. Londoners, meetings were held with potential investors and
26  Freeline's control persons at which the potential investors were introduced to
27  defendants by Endicott.  One such a meeting was held on November 17, 2010.  In
28

WASHOR & ASSOCIATES
Counselors at Law

1  that meeting, defendants made the same representations to potential investors
2  concerning Freeline's skate team, the demand for Freeline's products, Freeline's
3  existing inventory and product manufacturing and delivery pipelines, the amount
4  Freeline products on retail shelves for sale, Freeline's financial status, and Freeline's
5  ongoing marketing and manufacturing capabilities and efforts. At that meeting, Mr.
6  Chateauneuf represented that 25,000 pairs of skates had been shipped and sold.
7  Furthermore, defendants, and each of them, continued to fail to disclose the material
8  omissions set forth in paragraph 26 of this Complaint.  Among the attendees at the
9  November 17, 2010, was Michael Emmerman of Neuberger Berman.

10      With one exception, all of the significant investor meetings were attended by
11  Mr. Redepenning.

12      In January, 2011, Endicott was finally able to locate an investor group that
13  would agree to invest a minimum of $3,000,000 in Freeline. The group was solicited
14  based upon the same misrepresentations set forth above.  The lead investor was to
15  be Neuberger Berman. The location of the group fulfilled Endicott's remaining
16  obligations under the Agreement.  After some negotiation, the funding was set to
17  close in February, 2011.

18      37.    In mid-January, 2011, Harborview and Endicott discovered some of
19  Freeline's misrepresentations.  On further investigation and questioning, they
20  discovered more Freeline misrepresentations.  On discovery of many of the true
21  facts about Freeline, it became clear that investment in Freeline with its current
22  management was not warranted.  Upon discovery of the true facts, the investor
23  group located by Endicott was advised of same and the group elected to not
24  complete its investment in Freeline.

25      38.    When the bridge investors asked for the return of the bridge loan, they
26  discovered that Freeline did not have the funds to repay the loans.  They discovered
27  that rather than using the bridge loan funds to manufacture and sell products as had
28

WASHOR & ASSOCIATES
Counselors at Law

WASHOR & ASSOCIATES
Counselors at Law

1  been reported by Freeline to Endicott and the bridge investors, the funds had been
2  used to pay old Freeline obligations, including back salary to Freeline's control
3  persons, to pay additional salary to Freeline's control persons, to purchase insurance
4  to cover Freeline's control person's in the event that they were sued for securities
5  fraud, and various currently unknown other uses.  Very little, if any, was used to
6  manufacture and market products.

7  **FIRST CLAIM FOR RELIEF**

8  Securities Fraud; Violation of Section 10b

9  Londoner against all Defendants

10  39.  Plaintiffs incorporate herein by reference thereto each and every
11  allegation contained in paragraphs 1 through 27 and 61 of this Complaint as though
12  set forth herein in full.

13  40.  Plaintiffs are informed and believe and based thereon allege that Mr.
14  Farrelly, Ms. Tuzee, Mr. Chateauneuf, and Mr. Redepenning, and each of them, in
15  or before May, 2010, entered into a scheme to defraud Mr. Londoner, in violation of
16  Section 10(b) of the Securities and Exchange Act of 1934 and the Rules of the
17  Securities and Exchange Commission promulgated thereunder, by: (i) withholding
18  material information in connection with the foregoing factual misrepresentations
19  which would have made Plaintiffs aware that such statements were false and which
20  are set forth in paragraph 26; and (ii) intentionally making each of the
21  misrepresentations alleged in paragraphs 15, 19, 23, and 25 above.

22  41.  Defendants failed to disclose the falsity of the misrepresentations set
23  forth in paragraphs 15, 19, 23 and 25, and indeed restated many of them, to Mr.
24  Londoner prior to Mr. Londoner's investment on June 14, 2010, and failed to
25  disclose the material omissions set forth in paragraph 26.  The true facts relating to
26  the misrepresentations contained in paragraphs 15, 19, 23, and 25 statements set
27  forth in paragraphs 17, 20, 24, and 25.

28

42.   Had defendants provided correct or truthful information to Endicott or Mr. Londoner or disclosed the material omissions set forth in paragraph 26, Mr. Londoner would not have invested $185,000 in Freeline.

43.   Mr. Londoner reasonably and actually relied on the defendants' false statements and their duty to disclose material information in deciding to invest in Freeline.  Plaintiffs allege that such wrongful acts by defendants, and each of them, have directly resulted in Mr. Londoner making the investment alleged herein, which investment has resulted in a loss to Mr. Londoner of all or a substantial part of his investment.

44.   Plaintiffs are informed and believe and based thereon allege, that in making the false statements and omissions alleged above, defendants, and each of them, acted with the wrongful and malicious intent to deceive Mr. Londoner for the purpose of soliciting an investment from Mr. Londoner in reliance on such false representations and material omissions.

45.   As a proximate result of defendants' false statements and material omissions, Mr. Londoner has suffered damages in an amount, which plaintiffs to be in excess of $185,000 and which shall be determined at the time of trial.

46.   In making the representations referred to in paragraphs 17, 19, 23, and 25 above and the material omissions set forth in paragraph 26 above, defendants, and each of them, acted with a conscious disregard of Mr. Londoner's rights and were guilty of oppression, fraud, and malice, thereby entitling Mr. Londoner to recover punitive and exemplary damages.

## SECOND CLAIM FOR RELIEF

### Common Law Fraud

### All Plaintiffs against all Defendants

47.   Plaintiffs incorporate herein by reference thereto each and every allegation contained in paragraphs 1 through 38 and 61 of this Complaint as though

1 | set forth herein in full.

2 |     48.    Plaintiffs are informed and believe and based thereon allege that Mr.
3 | Farrelly, Ms. Tuzee, Mr. Chateauneuf, and Mr. Redepenning, and each of them, in
4 | or before May, 2010, entered into a scheme to defraud Mr. Londoner and Endicott,
5 | by: (i) withholding material information in connection with the foregoing factual
6 | misrepresentations which would have made Plaintiffs aware that such statements
7 | were false and which are set forth in paragraph 26; and (ii) intentionally making
8 | each of the misrepresentations alleged in paragraphs 15, 19, 23, and 25 above.

9 |     49.    In order to induce Mr. Londoner to invest in Freeline, Endicott to enter
10 | into the Agreement, and Endicott to continue to provide services to Freeline under
11 | the Agreement (including assisting in procuring bridge funding), Mr. Farrelly, Ms.
12 | Tuzee, Mr. Chateauneuf, and Mr. Redepenning, and each of them repeatedly made
13 | the representations set forth in paragraphs 15, 19, 23, and 25 between May 2010 and
14 | June 14, 2010 and made the material omissions set forth in paragraph 26. The true
15 | facts relating to set the misrepresentations set forth in paragraphs 15, 19, 23, and 25
16 | are contained in paragraphs 17, 29, 24, and 25, respectively. Additionally,
17 | defendants, and each of them, continued to make the same false representations to
18 | Endicott, Harborview, other bridge investors, and other potential investors as set
19 | forth in paragraphs 31, 32, 33, and 36 above.

20 |     50.    Defendants, and each of them, knew or should have known at the time
21 | that the representations set forth in paragraphs 15, 19, 23, 24, 31, 32, 33, and 36
22 | were made that they were false and that the true facts were as set forth in paragraphs
23 | 17, 19, 24, 25, and 32. Additionally defendants, and each of them, knew that the
24 | omissions set forth in paragraph 26 were material and should be disclosed.

25 |     51.    Had Mr. Londoner and Endicott known of the falsity of the
26 | representations set forth in paragraphs 15, 19, 23, and 25 above, or about the
27 | material omissions set forth in paragraph 26, Mr. Londoner would not have invested
28 |

WASHOR & ASSOCIATES
Counselors at Law

1  in Freeline and Endicott would not have entered into the Agreement or continued to

2  provide services to Freeline under the Agreement.  Therefore, in reasonable reliance

3  upon the representations contained in paragraphs 15, 19, 23, and 25 above, Mr.

4  Londoner invested in Freeline and Endicott entered into the Agreement and

5  continued to provide services to Freeline under the Agreement.

6  52.    As a proximate result of the fraudulent conduct of defendants, and each

7  of them, as set forth in paragraphs 15, 19, 23, 25, 31, 32, 33, and 36 above and the

8  material omissions set forth in paragraph 26, plaintiffs, and each of them, suffered,

9  and will continue to suffer, damages in a presently unascertained amount.   When

10  the exact amount of such damages is determined, Plaintiffs will seek leave of this

11  Court to amend this Complaint to insert same herein or, alternatively, Plaintiffs will

12  seek damages according to proof at trial.

13  53.    In making the representations and agreements referred to in paragraphs

14  15, 19, 23, 25, 31, 32, 33, and 36 above and the material omissions set forth in

15  paragraph 26, defendants, and each of them, acted with a conscious disregard of

16  plaintiffs' rights and were guilty of oppression, fraud, and malice, thereby entitling

17  plaintiffs, and each of them, to recover punitive and exemplary damages from

18  defendants, and each of them.

19  **THIRD CLAIM FOR RELIEF**

20  Negligent Misrepresentation

21  All Plaintiffs against all Defendants

22  54.    Plaintiffs incorporate herein by reference thereto each and every

23  allegation contained in paragraphs 1 through 38 and 61 of this Complaint as though

24  set forth herein in full.

25  55.    In order to induce Mr. Londoner to invest in Freeline, Endicott to enter

26  into the Agreement, and Endicott to continue to provide services to Freeline under

27  the Agreement (including assisting in procuring bridge funding), Mr. Farrelly, Ms.

28

WASHOR & ASSOCIATES
Counselors at Law

1  Tuzee, Mr. Chateauneuf, and Mr. Redepenning, and each of them repeatedly made
2  the representations set forth in paragraphs 15, 19, 23, and 25 between May 2010 and
3  June 14, 2010 and made the material omissions set forth in paragraph 26. The true
4  facts relating to set the misrepresentations set forth in paragraphs 15, 19, 23, and 25
5  are contained in paragraphs 17, 20, 24, and 25, respectively. Additionally,
6  defendants, and each of them, continued to make the same false representations to
7  Endicott, Harborview, other bridge investors, and other potential investors as set
8  forth in paragraphs 31, 32, 33, and 36 above.

9      56.    Notwithstanding the representations and agreements set forth in
10  paragraphs 15, 19, 23, 25, 31, 32, 33, and 36 above, defendants, and each of them,
11  did not know whether such representations and agreements were true at the time that
12  they were made or, alternatively, such representations and agreements were made
13  with a reckless disregard as to their truth.  Plaintiffs are informed and believe, and
14  upon such information and belief allege, that the true facts are as set forth in
15  paragraphs 17, 20, 24, 25, and 32.

16      57.    In reasonable reliance upon the representations contained in paragraphs
17  15, 19, 23, and 25 above, Mr. Londoner invested in Freeline and Endicott entered
18  into the Agreement.  In reasonable reliance upon the representations contained in
19  paragraphs 15, 19, 23, 25, 31, 32, 33, and 36 above, Endicott continued to provide
20  services to Freeline under the Agreement.

21      58.    Defendants made the representations and agreements set forth in
22  paragraphs 15, 19, 23, 25, 31, 32, 33, and 36 above without reasonable grounds for
23  believing them to be true.

24      59.    As a proximate result of the negligent misrepresentations of defendants
25  as set forth in paragraphs 15, 19, 23, 25, 31, 32, 33, and 36 above, plaintiffs
26  suffered, and will continue to suffer, damages in a presently unascertained amount.
27  When the exact amount of such damages is determined, plaintiffs will seek leave of
28

WASHOR & ASSOCIATES
Counselors at Law

1  this Court to amend this Complaint to insert same herein or, alternatively, plaintiffs

2  will seek damages according to proof at trial.

3  <center>**FOURTH CLAIM FOR RELIEF**</center>

4  <center>Violation of Section 20(a)</center>

5  <center>Londoner against all Defendants</center>

6       60.    Plaintiffs incorporate herein by reference thereto each and every

7  allegation contained in paragraphs 1 through 27 and 61 of this Complaint as though

8  set forth herein in full.

9       61.    Plaintiffs are informed and believe and based thereon allege that Mr.

10 Farrelly, Ms. Tuzee, Mr. Chateauneuf, and Mr. Redepenning were control persons

11 of Freeline Sports, Inc. within the meaning of §20(a) of the Securities and Exchange

12 Act, at all relevant times hereto.  Mr. Farrelly, Ms. Tuzee, and Mr. Chateauneuf

13 were represented as, and acted as the President, Chief Executive Officer and Chief

14 Operating Officer of Freeline, respectively, at all relevant times.  Plaintiffs are

15 further informed and believe, and based thereon allege, that Mr. Redepenning also

16 was actively involved at the executive level in the operations of Freeline.  Plaintiffs

17 are informed and believe and based thereon allege, that although Mr. Redepenning

18 was not a designated officer of Freeline, Redepenning assisted in the solicitation of

19 investments for Freeline by meeting with Mr. Londoner, Harborview, and other

20 potential investors, touting his experience as former executive at Stride Rite and

21 stating that he would join Freeline as COO after the bridge funding. In addition,

22 although Freeline's Bylaws provided for five (5) members, there were only four (4)

23 directors.  Plaintiffs are informed and believe, and based thereon allege, that Ms.

24 Tuzee, Mr. Chateauneuf, Mr. Farrelly, and Mr. Redepenning constituted, at all

25 relevant times hereto, all of the existing members of the Freeline Board of Directors,

26 together constituting a control block.  Plaintiffs are further informed and believe,

27 and based thereon allege, that the defendants, and each of them, also own a

28

WASHOR & ASSOCIATES
Counselors at Law

1  substantial and, together, controlling block of the issued and outstanding stock of

2  Freeline and, as a result, control its Board of Directors, and as such, profited

3  indirectly from Mr. Londoner's and Harborview's investment in Freeline.

4      62.    Plaintiffs are informed and believe and based thereon allege that each

5  such defendant, by reason of his or her position with Freeline and/or his or her stock

6  ownership in Freeline, had the power and authority to cause Freeline to engage in

7  the wrongful conduct complained of herein.

8      63.    Plaintiffs are informed and believe and based thereon allege that each

9  such defendant culpably participated in making and affirming the false

10  representations, and in failing to disclose the true information to Mr. Londoner, as

11  alleged above, prior to Mr. Londoner's making his investment in Freeline.

12      64.    As a proximate result of such wrongful conduct as a control person,

13  each such defendant is liable to Mr. Londoner for damages to be determined at trial.

**FIFTH CLAIM FOR RELIEF**

Breach of Fiduciary Duty

Endicott against all Defendants

17      65.    Plaintiffs incorporate herein by reference thereto each and every

18  allegation contained in paragraphs 1 through 38 and 61 of this Complaint as though

19  set forth herein in full.

20      66.    Plaintiffs are informed and believe and based thereon allege that Mr.

21  Farrelly, Ms. Tuzee, Mr. Chateauneuf, and Mr. Redepenning were control persons

22  of Freeline Sports, Inc. within the meaning of §20(a) of the Securities and Exchange

23  Act, at all relevant times.

24      67.    Plaintiffs are informed and believe, and based thereon allege, that at all

25  relevant times after Endicott commenced providing services to Freeline under the

26  Agreement, Freeline was insolvent in that its liabilities exceeded its assets.

27  Accordingly, at all relevant times after Endicott commenced providing services to

28

WASHOR & ASSOCIATES
Counselors at Law

1   Freeline and Endicott was entitled to monetary compensation from Freeline, each of

2   the defendants owed fiduciary duties to the creditors of Freeline, including Endicott,

3   to manage the assets of Freeline in a prudent, professional, competent and loyal

4   manner for the benefit of Freeline's creditors.

5        68.    Plaintiffs are informed and believe and based thereon allege that each

6   such defendant, by reason of his or her position with Freeline and/or his or her stock

7   ownership in Freeline, had the power and authority to cause Freeline to engage in

8   the wrongful conduct complained of herein.

9        69.    Plaintiffs are informed and believe, and based thereon allege, that each

10  such defendant breached his or her fiduciary duties to Freeline's creditors by

11  culpably participating in making and affirming the false representations, and in

12  failing to disclose the true information to plaintiffs, as alleged above, prior to

13  Endicott's provision of services to Freeline under the Agreement  Plaintiffs are

14  informed and believe and based thereon allege that each such defendant participated

15  in approving, on behalf of Freeline, the massive salary and severance increases

16  given to Mr. Farrelly, Mr. Tuzee and Mr. Chateauneuf and the purchase of an

17  insurance policy to protect them from a law suit for securities fraud in January 2011,

18  shortly before plaintiffs learned the truth about the Freeline's misrepresentations and

19  fraudulent omission to disclose material facts.  Plaintiffs are further informed and

20  believe, and based thereon allege, that each such defendant also participated in

21  corporate waste of Freeline's assets in order to cover up their prior

22  misrepresentations, including spending tens of thousands of dollars (more than the

23  projected profit on the sales of such merchandise) air shipping skates from China to

24  the United States to superficially stock retailers' shelves at the end of the 2010

25  Holiday season.  The foregoing acts of neglect and self-dealing violated Defendants'

26  fiduciary duties owed to Freeline's creditors, including Endicott.

27       70.    As a direct and proximate result of such breaches of fiduciary duties

28

WASHOR & ASSOCIATES
Counselors at Law

1   owed to Freeline's creditors, including Endicott, Endicott suffered damages in a
2   presently unascertained amount.    When the exact amount of such damages is
3   determined, plaintiffs will seek leave of this Court to amend this Complaint to insert
4   same herein or, alternatively, plaintiffs will seek damages according to proof at trial.

5                              **SIXTH CLAIM FOR RELIEF**

6                                   Breach of Contract

7                              Endicott against all Defendants

8        71.   Plaintiffs incorporate herein by reference thereto each and every
9   allegation contained in paragraphs 1 through 38 and 61 of this Complaint as though
10  set forth herein in full.

11       72.   As set forth in paragraph 10 above, Freeline is the alter ego of Mr.
12  Chateauneuf, Ms. Tuzee, Mr. Farrelly, and Mr. Redepenning.

13       73.   On June, 11, 2010, Endicott and Freeline entered into a Consulting
14  Agreement ("Agreement").   Mr. Londoner was also a party to the Agreement for the
15  limited purpose of confirming his decision to invest in Freeline's Series B2
16  Offering. The Agreement was modified and approved by Freeline's counsel.   The
17  Agreement contained, inter alia, the following material terms:

18       (a)   Endicott was to be paid a consulting fee of $7,500 per month.
19  The fee was to be accrued until the closing of an initial funding of $3,000,000.
20  Although the funding was arranged and ready to close, it did not close due to the
21  discovery of Freeline's fraud;

22       (b)   All of Endicott's reasonable business expenses were to be paid
23  after the completion of Stage 1 of the operating plan.  This stage was successfully
24  completed in the summer of 2010, when the bridge financing was obtained,
25  appropriate independent directors were presented, and an appropriate business plan
26  and an appropriate plan of operations were completed; and

27

28

WASHOR & ASSOCIATES
Counselors at Law

(c)   Freeline was to obtain specific percentage stock grants on the achievement of certain milestones.  The milestones were calculated based upon oral representations and summary financial data provided by Freeline and its control persons.  The initial milestones were not achieved due to the discovery of Freeline's fraudulent representations to Endicott, its bridge lenders, and other potential investors.

74.   Endicott performed all of the covenants and conditions required to be performed under the Agreement on its part, except for those excused by the prior breaches of Freeline.

75.   Freeline breached the Agreement by:

(a)   Failing to pay Endicott its monthly consulting fee;

(b)   Failing to reimburse Endicott for its out-of- pocket expenses; and

(c)   In order to provide services to Freeline under the Agreement, Endicott had to use the financial, product and other information, which it received from Freeline, since there was no other source.  Therefore, as an implied term of the Agreement, Freeline agreed to provide true and accurate information to Endicott for its use.  Freeline breached the Agreement by intentionally providing Endicott with inaccurate and untrue information to use in connection with providing consulting services under the Agreement.

76.   As a proximate result of the breaches of contract set forth in Paragraph 75 above, Endicott has been damaged in a presently unascertained amount.  When the exact amount of such damages is ascertained, Endicott will seek leave of this Court to amend this Complaint to assert same herein, or, in the alternative, will seek damages in accordance with proof at the time of trial.

/ / / /

/ / / /

/ / / /

WASHOR & ASSOCIATES
Counselors at Law

WASHOR & ASSOCIATES
Counselors at Law

**SEVENTH CLAIM FOR RELIEF**

Breach of the Covenant of Good Faith and Fair Dealing

Endicott against all Defendants

77.　Plaintiffs incorporate herein by reference thereto each and every allegation contained in paragraphs 1 through 38 and 61 of this Complaint as though set forth herein in full.

78.　As set forth in paragraph 10 above, Freeline is the alter ego of Mr. Chateauneuf, Ms. Tuzee, Mr. Farrelly, and Mr. Redepenning.

79.　On June, 11, 2010, Endicott and Freeline entered into a Consulting Agreement ("Agreement"). Every agreement contains an implied Covenant of Good Faith and Fair Dealing which provides that a party to an agreement must treat the other party fairly so as not to prevent the other party from receiving the benefits of the agreement for which such party negotiated.

80.　Freeline breached the Covenant of Good Faith and Fair Dealing in the Agreement by providing untrue and inaccurate information to Endicott and by failing to disclose material information which Endicott needed to provide services under the Agreement. By doing so, Freeline made it impossible for Endicott successfully to provide the services which it agreed to attempt to provide under the Agreement.　As a result of being unable to successfully provide its services, Endicott lost the compensation that it would have otherwise obtained despite working hard to provide such services for six (6) months.　By doing so, Endicott lost the opportunity to provide similar services to another company.

81.　As a result of the breaches of the Covenant of Good Faith and Fair Dealing as set forth in Paragraph 80 above, Endicott has been damaged in a presently unascertained amount.　When the exact amount of such damages is ascertained, Endicott will seek leave of this Court to amend this Complaint to assert same herein, or, in the alternative, will seek damages in accordance with proof at the

1 | time of trial.

2 |     82.    In breaching the Covenant of Good Faith and Fair Dealing as set forth

3 | in paragraph 80 above, defendants, and each of them, has been guilty of oppression,

4 | fraud, and malice, entitling Endicott to an award of punitive damages in an amount

5 | according to proof.

6 |     WHEREFORE, plaintiffs Kenneth L. Londoner and Endicott Management

7 | Partners, LLC, respectfully request that judgment be entered in their favor, and

8 | against defendants Freeline Sports, Inc., Renée Tuzee, Ryan Farrelly, Dennis

9 | Chateauneuf, and Charles W. Redepenning, and each of them, as follows:

10 |     1.    Compensatory damages in favor of Mr. Londoner, according to proof,

11 | against defendants, and each of them;

12 |     2.    Compensatory damages in favor of Endicott, according to proof, against

13 | defendants, and each of them;

14 |     3.    Punitive and exemplary damages in favor of Mr. Londoner and Endicott

15 | in an amount according to proof, against defendants, and each of them;

16 |     4.    Plaintiffs' reasonable attorney's fees;

17 |     5.    Plaintiffs' costs of suit incurred herein; and

18 |     6.    Such other and further relief as this Court may deem just and proper.

19 |     LAWRENCE I. WASHOR

20 |     WASHOR AND ASSOCIATES

21 |

22 | By:

23 |     LAWRENCE I. WASHOR

24 |     Attorneys for Plaintiffs

    Kenneth L. Londoner and Endicott

    Management Partners, LLC

25 |

26 | <u>DEMAND FOR TRIAL BY JURY</u>

27 | Plaintiffs hereby demand a trial by jury of all claims and issues in its

28 |

WASHOR & ASSOCIATES
Counselors at Law

1  Complaint on which it is entitled to a trial by jury.

2                                        LAWRENCE I. WASHOR
                                          WASHOR AND ASSOCIATES

3

4

5  By: _____
                                          LAWRENCE I. WASHOR
6                                         Attorneys for Plaintiffs
                                          Kenneth L. Londoner and Endicott
7                                         Management Partners, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WASHOR & ASSOCIATES
Counselors at Law

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV11- 421 JVS (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [_] **Western Division** | [X] **Southern Division** | [_] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

_____

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
LAWRENCE I. WASHOR, #75180
WASHOR & ASSOCIATES
21800 Oxnard Street, Suite 790
Woodland Hills, California 91367

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENDICOTT MANAGEMENT PARTNERS, LLC, a Delaware Corporation, and KENNETH L. LONDONER, a Connecticut resident<br><br>PLAINTIFF(S)<br><br>v. | CASE NUMBER<br><br>SACV11-00421 JVS (MLGx) |
| FREELINE SPORTS, INC., a Delaware Corporation,<br><br>see attached:<br><br>DEFENDANT(S). | **SUMMONS** |

TO:   DEFENDANT(S): THE ABOVE-NAMED DEFENDANTS

A lawsuit has been filed against you.

Within **21** days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Lawrence I. Washor _____, whose address is 21800 Oxnard Street, Suite 790, Woodland Hills, California 91367 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   MAR 1 6 2011 _____

By: _____   CHRISTOPHER POWERS
                        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1  LAWRENCE I. WASHOR
   WASHOR & ASSOCIATES
2  California Bar No. 75180
   lwashor@washor.com
3  21800 Oxnard Street, Suite 790
   Woodland Hills, California  91367
4  Telephone:  (310) 479-2660
   Facsimile:   (310) 479-1022
5  Attorneys for Plaintiffs Endicott Management Partners, LLC
   and Kenneth L. Londoner
6
7              UNITED STATES DISTRICT COURT
8              CENTRAL DISTRICT OF CALIFORNIA

**FILED**

**11 MAR 15 PM 2:51**

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

SACV11-00421 JVS MLGx

9  ENDICOTT MANAGEMENT            CIVIL ACTION NO.
   PARTNERS, LLC, a Delaware
   Corporation, and KENNETH L.
10 LONDONER, a Connecticut resident   COMPLAINT
11              Plaintiffs,
12      vs.
13 FREELINE SPORTS, INC., a Delaware
   corporation, RENEE TUZEE, a
14 California resident, RYAN
   FARRELLY, A California resident,
15 DENNIS CHATEAUNEUF, a
   Massachusetts resident AND
16 CHARLES W. REDEPENNING, a
   Massachusetts resident, INCLUSIVE,
17
18              Defendants.
19
20
21     Plaintiffs Endicott Management Partners, LLC ("Endicott") and Kenneth L.
22 Londoner by, and through, their attorneys, for their Complaint herein, respectfully
23 allege:
24                        **PARTIES:**
25     1.   Endicott Management Partners, LLC, is a limited liability company,
26 duly organized and existing under the laws of the State of Delaware.
27     2.   Kenneth L. Londoner is an individual residing in the State of
28

1

WASHOR & ASSOCIATES
Counselors at Law

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
ENDICOTT MANAGEMENT PARTNERS, LLC, a Delaware Corporation, and KENNETH L. LONDONER, a Connecticut resident

**DEFENDANTS**
FREELINE SPORTS, INC., RENÉE TUZEE, RYAN FARRELLY, DENNIS CHATEAUNEUF, AND CHARLES W. REDEPENNING, INCLUSIVE

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
LAWRENCE I. WASHOR, ESQ State Bar No. 75180
WASHOR & ASSOCIATES
21800 Oxnard Street, Suite 790, Woodland Hills, California 91367

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III.)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)
☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

SACV11-00421

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

UNITED STA   5 DISTRICT COURT, CENTRAL DISTRIC . JF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or

☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Delaware<br>Connecticut |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | Massachusetts<br>Delaware |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date _____

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |